IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

JOHN ASHFORD HILL,
      Plaintiff,

vs.                                      Case No.: 3:10cv68/WS/EMT

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,
      Defendant.
_____/

## REPORT AND RECOMMENDATION

       This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq*.  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34, and for Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

       Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

I.     PROCEDURAL HISTORY

       On July 8, 2004, Plaintiff filed applications for DIB and SSI, alleging in each application that he became disabled on January 23, 2004 (Tr. 332).[1]  The applications were denied initially and on reconsideration, and Plaintiff requested a hearing before an administrative law judge ("ALJ") (*id.*).

---

[1] All references to "Tr." refer to the transcript of Social Security Administration record filed on June 29, 2010 (Doc. 6).  Moreover, the page numbers refer to those found on the upper right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system.

Following a hearing held June 1, 2007, the ALJ issued a decision in which he found Plaintiff "not disabled" (Tr. 18, 332). Plaintiff requested review by the Appeals Council ("AC"), and in an order rendered March 13, 2008, the AC remanded Plaintiff's case to the ALJ for further consideration (Tr. 18). The ALJ conducted a supplemental hearing on November 21, 2008, and on December 30, 2008, issued a decision in which he again found Plaintiff "not disabled" (Tr. 18–41). Plaintiff requested review of the ALJ's second decision, and on January 4, 2010, the AC denied his request for review (Tr. 7–9). Thus, the ALJ's decision dated December 30, 2008, is the final decision of the Commissioner, now subject to review in this court. Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007); Falge v. Apfel, 150 F.3d 1320 (11th Cir. 1998). This appeal followed.

II.     RELEVANT FINDINGS OF THE ALJ

        A.      Findings That Do Not Take into Account Plaintiff's Substance Use Disorder

        The ALJ noted that the general time frame relevant to Plaintiff's claims is nearly five years, from January 23, 2004 (alleged onset date), through December 30, 2008 (date of the ALJ's decision), and that Plaintiff did not engage in substantial gainful activity after the alleged onset date (*see* Tr. 19, 23).[2] Plaintiff has the following severe impairments: degenerative disc disease ("DDD") of the lumbar spine, hypertension, depressive disorder, and seizure disorder (Tr. 23).[3] Plaintiff's impairments, alone or in combination, do not meet or equal a listed impairment (Tr. 28–29). Plaintiff cannot perform his past relevant work as a warehouse worker, tractor-trailer driver, or elevator installer/construction worker, in part, because that work was performed at medium or heavy levels of exertion, and Plaintiff's residual functional capacity ("RFC") is for light work (with certain

---

[2] This general time frame is the time frame relevant to Plaintiff's SSI claim, which includes the narrower time frame relevant to his DIB claim (that is, from January 23, 2004, alleged onset, through September 30, 2007, date last insured) (Tr. 22–23).

[3] The ALJ easily concluded at step two that Plaintiff's lumbar DDD is a severe impairment (*see* Tr. 23), but he "hesitantly" reached the same conclusion as to Plaintiff's hypertension, depressive disorder, and seizure disorder (Tr. 23; *see also* Tr. 23–28 (ALJ's explanation of his "hesitancy")).

restrictions) (Tr. 33).  Finally, Plaintiff can perform light work available in the national economy that accommodates his RFC; therefore, he is not disabled (Tr. 40).

       B.      Findings That Take into Account Plaintiff's Substance Use Disorder

      The ALJ's preliminary findings are the same as those noted *supra*, including his findings concerning the relevant time frame, Plaintiff's lack of work since his alleged onset, his severe impairments, and his inability to perform past relevant work.  When Plaintiff's substance abuse and related mental limitations are considered, however, the resulting RFC precludes all work and Plaintiff is therefore "disabled" (Tr. 31, 34).  Thus, because Plaintiff would <u>not</u> be disabled in the absence of substance abuse, his substance abuse disorder is a contributing factor material to the determination of disability.  He is therefore "not disabled" within the meaning of the Act.

III.      STANDARD OF REVIEW and CONSIDERATION OF SUBSTANCE USE DISORDERS

      Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  <u>Carnes v. Sullivan</u>, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1439 (11th Cir. 1997); <u>Walker v. Bowen</u>, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  <u>Boyd v. Heckler</u>, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* <u>Elam v. R.R. Ret. Bd.</u>, 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); <u>Falge</u>, 150 F.3d at 1322; <u>Lewis</u>, 125 F.3d at 1439; <u>Foote v. Chater</u>, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); <u>Lewis</u>, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the

evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  Id. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing substantial gainful activity, he is not disabled.

2.      If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.      If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.      Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his RFC and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national

economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen,
786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must
then prove he cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d
1007, 1011 (11th Cir. 1987).

      With regard to substance abuse, the Act was revised in March 1996 to prohibit an award of
benefits if such abuse is a contributing factor.  More specifically, the law now provides that, "An
individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or
drug addiction would (but for this subparagraph) be a contributing factor material to the
Commissioner's determination that the individual is disabled."  42 U.S.C. § 423(d)(2)(C).
Moreover, in cases where it is necessary to untangle substance abuse from other impairments, "[T]he
claimant bears the burden of proving that his alcoholism or drug addiction is not a contributing
factor material to his disability determination."  Doughty v. Apfel, 245 F.3d 1274, 1280 (11th Cir.
2001).  "The key factor we will examine in determining whether drug addiction or alcoholism is a
contributing factor material to the determination of disability is whether we would still find you
disabled if you stopped using drugs or alcohol."  20 C.F.R. § 404.1535(b)(1).  And in making this
determination:

> [W]e will evaluate which of your current physical and mental limitations, upon
> which we based our current disability determination, would remain if you stopped
> using drugs or alcohol and then determine whether any or all of your remaining
> limitations would be disabling.
>> (i)  If we determine that your remaining limitations would not be disabling,
>> we will find that your drug addiction or alcoholism is a contributing factor
>> material to the determination of disability.
>> (ii) If we determine that your remaining limitations are disabling, you are
>> disabled independent of your drug addiction or alcoholism and we will find
>> that your drug addiction or alcoholism is not a contributing factor material
>> to the determination of disability.

20 C.F.R. § 404.1535(b)(2).  "If the ALJ is unable to determine whether substance use disorders are
a contributing factor material to the claimant's otherwise-acknowledged disability, the claimant's
burden has been met and an award of benefits must follow."  Brueggemann v. Barnhart, 348 F.3d
689, 693 (8th Cir. 2003).  "A finding of disability is, in effect, a 'condition precedent' to applying

the special rule on alcoholism and drug addiction." *Id.* (citing 20 C.F.R. § 404.1535 and Frank S. Bloch, Bloch on Social Security § 3.39 (2003)).

IV.     RELEVANT PHYSICAL AND MENTAL HEALTH TREATMENT RECORDS

      A.     Physical

The earliest records in Plaintiff's file document approximately twelve emergency room ("ER") visits between 1989 and 2002, prior to the date Plaintiff alleges he became disabled (*see, e.g.*, Tr. 2–3). These records reflect treatment for accidents or injuries and, at times, reflect that Plaintiff smelled of alcohol upon arrival at the ER (*see, e.g.*, Tr. 142–43, 146, 155, 164, 230). They also reflect treatment for seizures or seizure-related falls (the records often include a notation that Plaintiff's seizures coincided with alcohol withdrawal and/or Plaintiff's failure to take Dilantin as prescribed and directed) (Tr. 145, 179–81, 183–87, 190, 210, 215, 230, 233). The earlier records also reflect that a March 2001 head CT scan was normal, and a November 2001 MRI of the brain was essentially negative (Tr. 184, 442). Additionally, Plaintiff was advised on March 13, 2001, that he should seek follow up treatment for his seizures with his regular physician and that if he did not have a regular physician, "he may follow up with [the] Escambia County clinic" (Tr. 184). Finally, the records reflect that Plaintiff received treatment for his seizures (approximately) three times between November 2001 and February 2002—outside the ER—from Jorge M. Pelaez, M.D. (Tr. 197–208). Plaintiff told Dr. Pelaez he was in a motorcycle accident in or about 1990 and that he started having seizures about two months after the accident (Tr. 205). Dr. Pelaez noted Plaintiff's noncompliance with seizure medications and at Plaintiff's last visit assessed epilepsy (manifested with generalized motor convulsions), history of alcohol abuse, depression, and tremors (most likely essential, as opposed to alcohol related) (*see* Tr. 197–98).

In late January 2004, in connection with a workers' compensation claim, Plaintiff presented to Ramon Ryan, M.D., with complaints of low back and right groin pain (Tr. 240). Plaintiff stated he injured his back at work on January 23, 2004 (the date he alleges he became disabled), while lifting some materials over his head (*id.*). Dr. Ryan assessed low back strain, prescribed Lortab, and limited Plaintiff to "sitting duties" with elevation of the right leg (*id.*). Plaintiff returned one week later and reported that he was "okay" when sitting but had a lot of back pain if he stood or walked (Tr. 239). Dr. Ryan increased Plaintiff's Lortab and continued the "sitting duty" restriction (*id.*).

On February 4, 2004, Plaintiff called Dr. Ryan and reported that his Lortab was either lost or stolen, and he requested a refill (Tr. 236). Dr. Ryan was not comfortable refilling the prescription (*id.*). Plaintiff returned on February 6 and saw J. Ole Olsen, III, M.D. (who is apparently a partner of Dr. Ryan) (*id.*). Plaintiff complained of excruciating pain in the lumbosacral area (*id.*). Dr. Olsen agreed with Dr. Ryan's assessments, maintained Plaintiff's work restrictions, counseled Plaintiff about the need to "keep track" of controlled substance medications, and continued Plaintiff's Lortab (*id.*). Plaintiff returned on February 9, and Dr. Ryan reviewed with Plaintiff the results of a February 6 lumbar MRI (*see* Tr. 236, 238). Dr. Ryan noted that the MRI revealed some nerve root compression at L3, nerve root displacement at L5, and degenerative changes in the facet joints in the lower lumbar region (Tr. 238; *see also* Tr. 444). He assessed low back strain with nerve root compression, limited Plaintiff to "sitting duties" with the use of a cushion, and prescribed Lortab (Tr. 238). At Plaintiff's last visit, on February 13, 2004, he reported low back pain, right buttock pain, and weakness in the right leg (Tr. 237). He also stated that use of "the doughnut cushion was not particularly helpful and that sitting at work even for four hours or so is causing a great deal of pain" (*id.*). Dr. Ryan placed Plaintiff "off work," continued his Lortab, and recommended referral to a neurosurgeon (*id.*).

On February 14, 2004, Plaintiff presented to an ER with complains of lumbar pain (Tr. 243). A strong odor of alcohol was detected (*id.*). Plaintiff was diagnosed with low back pain and acute myofascial strain (Tr. 243, 247). He was discharged with prescriptions for Percocet and Flexeril (*id.*).

On February 26, 2004, in connection with his workers' compensation claim, Plaintiff presented to Philip C. Benton, M.D., with complaints of right buttock and groin pain (Tr. 251). Dr. Benton restricted Plaintiff from all work until his next appointment (Tr. 252). Plaintiff returned on March 1, 2004 (Tr. 250). Dr. Benton compared recent x-rays with Plaintiff's lumbar MRI and opined that examination findings and Plaintiff's complaints were consistent with paracentral disc herniation at L3-L4 (*id.*). He suggested that the other lumbar abnormalities were pre-existing or chronic conditions (*see id.*). Dr. Benton administered epidural facet block injections at L3-L4 and L4-L5, and he noted that Plaintiff "arose from the table with relief of his symptoms" (Tr. 250). Plaintiff was placed at "total temporary disability for a trial of one week" (*id.*). At Plaintiff's last

visit, on March 9, 2004, he reported "some improvement" with the facet blocks (Tr. 249). Nevertheless, a right L3-L4 semihemilaminotomy and disectomy were discussed, Plaintiff stated his desire to proceed the procedure, and Dr. Benton indicated that the "plan" was to so proceed (*see id.*).

On April 23, 2004, Plaintiff was examined at the "Health & Hope Clinic" (Tr. 253).  He complained of low back pain that radiated to the right groin and knee, as well as anxiety, depression, weight loss, and numbness in the leg (presumably the right leg) that caused him to fall (*id.*).  Clinic notes reflect that Plaintiff was worked up for surgery by Dr. Benton, but workers' compensation "dropped him" (*id.*).  Examination of the back revealed a fair range of motion with 4/5 strength in the "right leg groups" secondary to pain, and examination of the hip revealed pain on internal rotation to the groin (Tr. 254).  Plaintiff was diagnosed with abnormal discs with impingement from the work-related accident, hip pain since the accident with "L3 radiculopathy vs. additional injury to hip joint," and anxiety and depression (*id.*).

Four days later, on April 27, 2004, Plaintiff was taken to an ER by the police due to his intoxication, a possible injury, and the need for medical clearance before admitting Plaintiff to the county jail (*see* Tr. 256).

On November 12, 2004, Richard W. Lucey, M.D., performed the first of three consultative physical examinations (Tr. 260–65).  Dr. Lucey reviewed Plaintiff's lumbar MRI which, he stated, indicated compression of existing right L3 nerve root, some encroachment on the right lateral recess, bilateral foraminal stensosis at L5-S1 (with a posterior disc bulge combining with facet hypertrophy), and a posterior disc bulge asymmetric to the left at the L4-L5 level, producing some posterior displacement of the left descending L5 nerve root in the lateral recess (Tr. 260).  Dr. Lucey also noted that Plaintiff experienced seizures since (approximately) 1989, and that he had a seizure about once or twice a month (*id.*).  He noted that Dr. Pelaez placed Plaintiff on daily long-term Dilantin, but Plaintiff was not presently taking any medications.  Plaintiff told Dr. Lucey that no other treatments had been instituted for the seizures (*id.*).  Dr. Lucey reported that Plaintiff exhibited a strong odor of alcohol and that Plaintiff told him he had a history of problems with alcohol but was now drinking only about four quarts of malt beer daily (Tr. 262).  Dr. Lucey also noted that Plaintiff exhibited some fine tremor in his hands and head (*id.*).

Dr. Lucey's examination revealed: 1) full grip strength in the upper extremities, 2) normal fine manipulatory movements; 3) full range of movement of all major joints with no weakness, atrophy, sensory deficits, joint deformities, effusion, crepitus, or laxity; 4) normal deep tendon reflexes; 5) no edema or varicosities in the lower extremities; and 6) intact peripheral circulation (Tr. 261).  Plaintiff's straight leg raising tests were negative to full extension sitting and to sixty degrees supine (*id.*).  Examination of the back disclosed an erect posture, normal gait, and heel, toe, and tandem walking without evidence of weakness or ataxia (*id.*).  Dr. Lucey noted that Plaintiff presented with a cane, but he was examined without it and displayed no difficulties, although Plaintiff transferred somewhat slowly due to "subjective complaints of discomfort" (*id.*).  Additionally, range of movement of the thoracolumbar spine was diminished, greatest in forward flexion because of complaints of low back pain, and slightly in the cervical spine (Tr. 261, 263).  Dr. Lucey assessed disc disease of the lumbar spine with chronic low back syndrome and history of sciatica, seizures, chronic depression with anxiety, and chronic alcohol abuse (Tr. 262).

On March 8, 2005, Tim Hukill, a State Agency medical consultant (it is unclear whether he is a physician), completed a Physical RFC Assessment.  He opined that Plaintiff could lift and carry fifty pounds occasionally and twenty-five pounds frequently; stand, walk, and sit six hours in an eight-hour workday; and push and pull without limit (Tr. 287).  He additionally opined that Plaintiff had no communicative, manipulative, postural, visual or environmental limitations, except the need to avoid hazards, such as heights and machinery, due to seizures (Tr. 288–90).  He indicated that his opinions were based in part on the results of Dr. Lucey's November 2004 examination and Plaintiff's reported ability to walk four blocks, shop, prepare simple meals, and carry groceries, including a gallon of milk (*see* Tr. 287–88, 291).  On August 4, 2005, M. B. Jeffrey, M.D., another medical consultant, completed a physical RFC assessment (Tr. 294–301).  He opined that Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently; stand, walk, and sit six hours in an eight-hour workday; and push and pull without limit (Tr. 295).  His opinions were otherwise the same as those of Tim Hukill, but Dr. Jeffery additionally opined that Plaintiff should never climb ladders, ropes, or scaffolds, and should only occasionally stoop or climb ramps and stairs (*see* Tr. 296–98).  He based his opinions in part on the results of Dr. Lucey's examination, as well as the fact that Plaintiff had "no ongoing relationship with a doctor" and drank alcohol "which is contraindicated with a seizure disorder" (Tr. 296).

On August 22, 2005, Dr. Lucey again examined Plaintiff (Tr. 302–07).  Plaintiff reported
lower back and thigh pain, as well as difficulty with stairs or repetitive bending, stooping, or lifting
(Tr. 302).  He stated he was not taking any medications and was not receiving any medical treatment
due to a lack of funds (*id.*).  Plaintiff stated he had two seizures since the January 2004 work-related
accident (*id.*).  Dr. Lucey's examination produced essentially the same results as his November 2004
examination, and he diagnosed a history of seizure disorder, disc disease of the lumbar spine
associated with chronic low back pain and sciatica, and history of chronic depression with anxiety
(*see* Tr. 303–04).

On July 10, 2007, Plaintiff presented to an ER with complaints of a seizure, which resulted
in Plaintiff striking the back of his head on a wall (Tr. 403).  Plaintiff reported that he "stopped his
Dilantin six months ago" (*id.*).  Notes reflect that Plaintiff "absolutely refused" any tests or lab work,
including a blood draw, and that he left the hospital "without treatment/against medical advice"
("AMA") (*see* Tr. 403–05).

On May 20, 2008, Plaintiff presented to the Escambia Community Clinic ("ECC") and stated
that he needed medication for epilepsy (Tr. 456).  He also complained of chronic back pain,
"tingling in his left leg," sleeping difficulties, and an inability to "sit or stand for prolonged periods
of time" (*id.*).  Plaintiff noted that he had been treated for a work injury and related back pain by Dr.
Benton, and he admitted that he failed to follow up with Dr. Benton (*id.*).  Mental and neurological
evaluations were essentially normal (Tr. 456–57).  Additionally, Plaintiff had a normal gait and
posture but exhibited some musculoskeletal spasm and tenderness over the lumbar vertebra, as well
as painful flexion, but no tenderness over the thoracic vertebra, sacral vertebra, or sacroiliac region
(Tr. 457).  Plaintiff was assessed with low back pain, epilepsy, and hypertension, and Flexeril,
Anaprox, and Dilantin were prescribed  (*id.*).

Plaintiff returned to the ECC on July 9, 2008 (Tr. 452).  Physical and mental examinations
yielded essentially the same results, although at this visit it was noted that Plaintiff had a negative
crossed straight leg raising test and no decreased range of motion during spine/musculoskeletal
testing (*see* Tr. 452–53).  Plaintiff's medications were continued, and he was provided with a sample
of Phenytek (an additional medication for his epilepsy) (*see id.*).  A notation in the ECC records
dated July 14, 2008, states as follows:  "Patient sent We Care information on May 20, 2008 outlining

documents needed to proceed with referral.  As of July 14, 2008 no response from patient.  Referral cancelled." (Tr. 450).

On July 25, 2008, a lumbar x-ray with obliques was obtained, which revealed severe DDD at L5-S1 and less severe degeneration at the remaining lumbar levels (Tr. 420).

In September 2008, Dr. Lucey conducted a third, consultative physical examination (Tr. 421–28).  Plaintiff complained of chronic pain in the lumbar spine that extended into the midline of his lumbar spine to his tail bone, and he stated that the pain was aggravated by bending, stooping, or lifting (Tr. 422).  Dr. Lucey's examination yielded essentially the same results as before, and he assessed severe DDD at L5-S1 and less severe DDD at the remaining lumbar levels, as well as "degenerative arthritis [of the] lumbar spine by x-ray" (*id.*).  Dr. Lucey completed a physical RFC assessment, on which he opined that Plaintiff could lift and carry up to twenty pounds occasionally and ten pounds frequently; sit up to six hours (in two-hour increments), stand up to four hours (in one-hour increments) and walk up to one hour (in thirty-minute increments) (Tr. 423–24).  He noted that Plaintiff would have some limitations using his hands and legs because, for example, frequent use of the legs may aggravate his low back condition.  He likewise opined that Plaintiff would occasionally have environmental and postural limitations and should altogether avoid crawling or climbing ladders and scaffolds (Tr. 425–27).  Finally, he opined that Plaintiff's basic daily activities and ability to care for himself would not be substantially affected by his impairment (*see* Tr. 428).

The last treatment record from ECC is dated October 9, 2008, and it reflects that Plaintiff's seizure condition had "been stable" with "no activity lately" (Tr. 445).  Moreover, Plaintiff described his back pain as follows:  "The onset . . . has been variable and has been occurring in an intermittent pattern for years.  The course has been recurrent.  The . . . pain is described as a moderate dull aching . . . [and] as being located in the lower back.  The pain radiates to the lateral aspect of the left leg [with] exacerbation at times." (*id.*).  Plaintiff reported that he drank beer occasionally, smoked marijuana about three times a month, and smoked a pack of cigarettes daily (*id.*).  Physical and metal examinations were essentially the same as those conducted in May 2008 (*see* Tr. 445–46).

B.    Mental

On February 18, 2005, Plaintiff was examined by John W. Keller, Ph.D., at the request of the Division of Disability Determinations ("DDS")  (Tr. 266).  Plaintiff, who was accompanied by his sister, told Dr. Keller he quit school after the ninth grade, at which time he was in regular classes (Tr. 266–67).  Plaintiff advised he began experiencing seizures about fifteen years earlier, or in approximately 1990 (Tr. 267).  He also advised he "had to check into a local mental health center four years ago [2001] due to alcohol abuse and since that time has [consumed] no alcohol," and that, with the exception of treatment for alcoholism, he had never seen a psychologist or psychiatrist (*id.*). Finally, Plaintiff reported that he lived in the back of a truck and cooked on a barrel (Tr. 268).  Dr. Keller diagnosed mood disorder with depressed features related to lumbar DDD, epilepsy, high blood pressure, a lung problem, and alcoholism in sustained remission (*id.*).  Dr. Keller opined that Plaintiff's prognosis for employment was poor because of his medical problems, especially the epilepsy and DDD (*id.*).

On March 7, 2005, Judith A. LaMarche, Ph.D., a non-examining agency psychologist, completed a Psychiatric Review Technique Form ("PRTF") and Mental RFC Assessment (Tr. 269–81, 282–85).  She evaluated Plaintiff's conditions under Listing 12.04 (Affective Disorders) and Listing 12.09 (Substance Addiction Disorders) (Tr. 269).  She concluded that neither Plaintiff's mood disorder with depressed features, nor his alcoholism, satisfied the criteria of the listings (Tr. 271, 276).   Additionally, she assessed "none," "mild," or—at most—"moderate" functional limitations (Tr. 278, 282–83).  In the narrative section of her report, among other comments, Dr. LaMarche noted that Plaintiff advised Dr. Keller he had abstained from alcohol for four years (or, since approximately 2001), but ER records from September 2002 reflect that Plaintiff was brought in by the police for detoxification and was too inebriated to sign a consent form (Tr. 280).  She also noted that Dr. Keller's diagnosis of alcoholism in remission, which was based on Plaintiff's report, is refuted by other evidence in the record (*id.*).

On August 31, 2005, Frank A. Brown, Ph.D., performed a psychological consultative evaluation of Plaintiff at the request of the DDS (Tr. 308–10).  Plaintiff stated he was disabled because of stress and back problems (Tr. 308).  He stated he had seizures that began in approximately 1984 (Tr. 309).  He also reported he was a "chronic drunk" from age thirteen through forty-five (or, from approximately 1972 through 2004), that  he drank a fifth of vodka daily from

age eighteen through forty-five, and that alcohol had destroyed his working life (*id.*).  Plaintiff stated he "managed to 'get off' alcohol" in the last year, but in actuality had only lessened his use and switched to beer (noting he had "maybe five beers max" if he is irritated).  He stated he was hospitalized in the Lakeview Center for detoxification twice in the last four years, in (approximately) 2001 and 2003 (*id.*).  He said Alcoholic Anonymous "was a joke," and he admitted to current, but infrequent, marijuana use, as well as a history of regular marijuana use and some "acid" and cocaine use (*id.*).  Plaintiff stated he had been living with a roommate for the past year, a contradiction—Dr. Brown noted—from what Plaintiff told Dr. Keller (that is, that he lived in the back of a truck) (*id.*).  As for activities of daily living, Plaintiff reported he rode the city bus, washed dishes and clothes, carried out the garbage,  watched television, and dated (*id.*).  Plaintiff reported that the happiest times of his life were "hanging out" and drinking with his co-workers (Tr. 310). Dr. Brown diagnosed Plaintiff with history of alcohol dependence, antisocial personality disorder, and adjustment disorder with depressed mood, and he noted that Plaintiff was "still abusing alcohol, at [the] least" and was likely still dependent on alcohol (*see id.*).  Finally, Dr. Brown opined that Plaintiff could manage his own finances (Tr. 310).

On September 13, 2005, James B. LeVasseur, Ph.D., a non-examining agency consultant, completed a Mental RFC Assessment and PRTF (Tr. 311–28).  In all significant respects, Dr. LeVasseur's opinions were the same as those of Dr. LaMarche (*see id.*).

Finally, on July 13, 2008, Susan A. Danahy, Ph.D., evaluated Plaintiff at the request of the DDS and completed a Mental RFC Assessment (Tr. 409–19).  In relevant part, Plaintiff reported he had experienced seizures since approximately 1998, but he could not (or would not) definitively state how often he had them (*see* Tr. 410).  Dr. Danahy noted that Plaintiff was somewhat vague about his history, volunteered little information, and did not report he had been hospitalized in relation to his alcoholism (*see* Tr. 410–11).  Upon further questioning, however, Plaintiff stated he had been hospitalized at Lakeview for three or four days twenty-two years ago (or, in approximately 1986) (Tr. 411).  Plaintiff emphasized that his hospitalization was not court-ordered, expressed irritation with the fact his drinking was "being brought up," stated he did not consider his alcohol intake to be a problem, reported drinking only an "occasional" beer (that is, three to four beers in a ten-day period), and admitted to infrequent marijuana use (which, according to Plaintiff, also was

"not a problem") (*id.*).  Dr. Danahy noted that Plaintiff had "a very significant arrest history and could not even estimate how many time he had been arrested," which—Dr. Danahy noted—was "a good example of the fact that [Plaintiff] would give superficial answers to questions, [and] did not seem to want to put enough effort out to come up with specific details" (*id.*).  He did report spending time in jail, getting two "DUI's," and being a habitual traffic offender (*id.*).  Dr. Danahy conducted intelligence quotient ("IQ") testing, the results of which are discussed more fully *infra*, she assessed a current GAF score of 51,[4] and she opined on the RFC assessment that Plaintiff has "none," "moderate," or "moderate to marked" mental limitations (Tr. 413,  415, 417–18).

V.      DISCUSSION

Plaintiff raises three issues in this appeal, which the undersigned addresses in the following order.  First, Plaintiff contends the ALJ erred in determining he had no impairment that meets or equals Listing 12.05 ("Mental Retardation") (Doc. 14 at 15).  Second, Plaintiff asserts the ALJ erred in failing to properly evaluate his subjective complaints (*id.* at 18).  And third, he contends the ALJ erred in concluding that his substance use is a contributing factor material to his disability (*id.* at 12).

A.      Listing 12.05

Plaintiff contends the ALJ erred in failing to find that he has a mental impairment that meets the criteria of Listing 12.05, subsection C.  The Commissioner states that the ALJ did not err because the record does not support a finding that Plaintiff's impairment meets or equals the listing.

The Commissioner's rules provide that if a claimant has an impairment that is listed in or equal to an impairment listed in Appendix 1, Subpart P, following 20 C.F.R. § 404.1599, then a finding of disability will be made at step three without considering the claimant's age, education, and work experience.  20 C.F.R. § 404.1520(d).  "The Secretary explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard.  The listings define impairments that would prevent an adult, regardless of his age, education, or work

---

[4] Global assessment of functioning ("GAF") is the overall level at which an individual functions including social, occupational, academic, and other areas of personal performance.  American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 30–32 (4th ed. 1994).  It may be expressed as a numerical score.  *Id.* at 32.  A score between 51 and 60 reflects *moderate* symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning  (e.g., few friends, conflicts with peers or co-workers).  *Id.*

experience, from performing any gainful activity, not just 'substantial gainful activity.'"  Sullivan v. Zebley, 493 U.S. 521, 532, 110 S. Ct. 885, 892, 107 L. Ed. 2d 967 (1990).  A claimant is entitled to benefits if it is shown that his or her limitations meet, or are medically or functionally equal to, the limitations set forth in the listing.  Shinn ex rel. Shinn v. Comm'r., 391 F.3d 1276, 1282 (11th Cir.2004).

A claimant has the burden of proving that his impairments meet or equal a listed impairment by presentation of specific evidence of medical signs, symptoms, or laboratory test results meeting all of the specified medical criteria.  Sullivan, 493 U.S. at 530.  "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  Id.

Listing 12.05 begins with an introductory paragraph, that states, "Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."  20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05.  The listing further provides that the "required level of severity for this disorder is met when the requirements in [subsections] A, B, C, or D are satisfied."  Id.  And subsection C requires, "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."  Id., § 12.05C.

The Eleventh Circuit has determined that in order to be considered for disability benefits under Listing 12.05, a claimant must at least (1) have significantly subaverage general intellectual functioning; (2) have deficits in adaptive functioning; and (3) have manifested deficits in adaptive behavior before age twenty-two.  Pettus v. Astrue, 226 Fed. Appx. 946, 948 (11th Cir. April 5, 2007) (citing Crayton v. Callahan, 120 F.3d 1217, 1219 (11th Cir. 1997)).  Additionally, consistent with the terms of the listing, the Eleventh Circuit has stated that for presumptive disability under 12.05C, a claimant must have (1) a valid IQ score of 60 through 70 inclusive, and (2) an additional mental or physical impairment significantly affecting the claimant's ability to work.  Id. at 1219–20.

In this case the Commissioner apparently agrees (see doc. 19 at 12–14), and the undersigned finds, that Plaintiff has a physical or mental impairment that imposes "an additional and significant work-related limitation of function."  As previously noted, the ALJ determined that Plaintiff's

lumbar DDD, hypertension, depressive disorder, and seizure disorder are "severe" impairments, which—by definition—are impairments that significantly limit physical or mental ability to perform "basic work activities."   *See* 20 C.F.R. § 404.1520(c); *see also, e.g.*, Etheridge v. Astrue, No. 08-00357/WS/B, 2009 WL 3233899 (S.D. Ala. Sep. 29, 2009) (finding of severe physical impairments at step 2 *ipso facto* was a finding that claimant had shown an impairment as required by the second prong of Listing 12.05C); Carroll v. Astrue, No. 1:08cv74/SRW (M.D. Ala. June 17, 2009), 2009 WL 1708073, at *2 (same).   Moreover, the ALJ noted, "there is radiological evidence of an underlying medically determinable musculoskeletal impairment of [DDD] of the lumbar spine that could reasonably be expected to cause pain and exertional limitations, and thereby hav[e] more than a minimal impact on [Plaintiff's] functional capacity" (Tr. 24).   Thus, at the very least (that is, without considering Plaintiff's hypertension, depressive disorder, and seizure disorder), Plaintiff's lumbar DDD imposes an additional and significant work-related limitation of function.

The question thus becomes whether the record contains evidence of a valid IQ score between 60 and 70.   Plaintiff points to the IQ scores assessed by Dr. Danahy (Doc. 14 at 15 (referencing Tr. 413[5])).   Indeed, as part of Dr. Danahy's evaluation she administered the Wechsler Adult Intelligence Scale ("WAIS")-III test to Plaintiff, which resulted in the following IQ scores:  74 (verbal), 69 (performance), and 69 (full-scale) (Tr. 413).

While both the performance and full-scale IQ scores of 69 fall within the criterion set forth in Listing 12.05C, the Commissioner contends that those IQ scores are not valid (*see* Doc. 19 at 12). In support of his contention, the Commissioner points to Dr. Danahy's opinions that:  1) Plaintiff's verbal IQ score of 74, which is in the borderline range, is "reasonably representative of [Plaintiff's] usual level of functioning"; 2) Plaintiff may have performed better if "he had not given up as quickly as test items became harder"; 3) overall, Plaintiff's "performance did not suggest neuropsychological difficulties as much as somewhat below average intellectual functioning"; 4) Plaintiff would have

---

[5] The undersigned issued a scheduling order in this case, in which the parties were advised to provide a detailed analysis of the record and that failure to support factual contentions with accurate, precise citations to the record would result in the contention(s) being disregarded for lack of proper development (Doc. 7).  Here, Plaintiff complied with this directive by accurately referencing page 413 of the transcript.  Because Plaintiff referenced no other IQ score in the 60 to 70 range, however, the court assumes—as it stated it would—that no other such IQ score exists (moreover, the court has found no other IQ scores in the record).

no difficulty making judgments on simple work-related decisions, or in understanding, remembering, and carrying out simple instructions; and 5) Plaintiff would be limited to skilled or semi-skilled occupational tasks requiring some manual labor (*id.* (referencing Tr. 412–13, 417)).[6]  In further support, the Commissioner points to the following evidence in the record:  1) Plaintiff's report that he attended school through the ninth grade and was in regular classes; 2) Plaintiff's work history; and 3) Dr. Brown's August 2005 report, which states that Plaintiff can manage his own finances, contains no limitations or restrictions, includes an estimation of Plaintiff's intellectual functioning as at least lower average (as demonstrated, in part, by the vocabulary Plaintiff used during the examination, including words such as "foreseen, accessible, and curbed"), and describes Plaintiff's thoughts as having "a decent pace" (Doc. 19 at 13–14 (referencing Tr. 113, 108, 308–10, respectively)).

The ALJ acknowledged Dr. Danahy's evaluation, but—for essentially the same reasons asserted by the Commissioner here—determined that Plaintiff's impairment does not meet or equal Listing 12.05C (*see* Tr. 30).  The undersigned concludes the ALJ did not err in this regard.

Initially, there is evidence within Dr. Danahy's own report to suggest that Plaintiff's IQ scores of 69 are invalid.  This evidence includes her opinion that Plaintiff's verbal IQ score "in the borderline range" likely represents of his usual level of functioning, her impression that Plaintiff likely had the ability to perform better on the WAIS-III than he did, her opinion that Plaintiff would work best at skilled and semi-skilled occupations, her comment that one of Plaintiff's lowest subtest scores was on the "Digit Symbol" subtest, but that test was likely affected by Plaintiff's tremors (as opposed to a mental deficit), and her indication that Plaintiff's academic skills, including those relating to reading, comprehending sentences, spelling, and computing math, "cluster in the borderline range" (*see* Tr. 410, 413–14).[7]

---

[6] Dr. Danahy also opined—as the ALJ noted—that "intellectually, [Plaintiff] is capable of handling his own financial affairs" (Tr. 31, 416).

[7] The ALJ acknowledged a statement by Dr. Danahy that Plaintiff's IQ scores are "reasonably valid" (which statement, the undersigned notes, is not a definitive statement regarding the scores' validity), but he concluded, as Dr. Danahy opined, that Plaintiff's "true ability" was in the borderline range (Tr. 30 (quoting Tr. 414, 417)).

Moreover, even if Dr. Danahy's IQ scores are valid, they do not satisfy the criterion of the listing because they are inconsistent with other evidence in the record, including Plaintiff's reports that he held full time employment for more than fourteen years, from 1986 through 2001; that his past work includes work as an elevator installer, laborer, and carpenter helper, which jobs required the use of machines, tools, and/or equipment, and as a truck driver for about six years, which job required a commercial driver's license; and that he quit working due to seizures, not mental deficits (Tr. 100, 107–08, 267, 308; *see also* Tr. 91 (reflecting annual earnings as high as $18,716.15 at or near the time Plaintiff reported working)).  Additionally, Plaintiff attended school through the ninth grade in regular classes (Tr. 113), which belies a finding that Plaintiff has deficits in adaptive functioning that initially manifested prior to the age of twenty-two.  *See* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) ("This court . . . has recognized that a valid I.Q. score need not be conclusive of mental retardation where the I.Q. score is inconsistent with other evidence in the record on the claimant's daily activities and behavior.")[8] (citing Popp v. Heckler, 779 F.2d 1497, 1499 (11th Cir. 1986) (rejecting claim of mental retardation under 12.05C where claimant's IQ score of 69 was inconsistent with evidence that he had a two-year college associate's degree, was enrolled in a third year of college as a history major, and had worked in various technical jobs such as administrative clerk, statistical clerk, and algebra teacher))[9]; *see also* Bischoff v. Astrue, No. 07-60969-CIV,  2008 WL 4541118 (S.D. Fla. Oct. 9, 2008) (affirming determination that Listing 12.05C was not met even though IQ scores were below 70, noting (among other factors) that claimant previously worked as a parts manager and automobile mechanic, jobs which required technical knowledge and skills, and he successfully supervised other people for five years); Davis v. Astrue, No. 2:07cv880/TFM, 2008 WL 2939523 (M.D. Ala. Jul. 25, 2008) (although claimant had an IQ score under 70, she had completed twelfth grade, received training in cosmetology and

---

[8] In Lowery, the Commissioner conceded that the IQ score was valid and that the claimant had additional work-related limitations.  979 F.2d at 838.  Hence, the only issue was whether there was evidence that the mental retardation manifested itself before age 22.  *Id.*

[9] The undersigned recognizes that in Hodges v. Barnhart, 276 F.3d 1265, 1268 (11th Cir. 2001), the court held that "absent evidence of sudden trauma that can cause retardation, the IQ tests create a rebuttable presumption of a fairly constant IQ throughout her life."  But a valid IQ score is not conclusive of mental retardation where, as here, the IQ score is inconsistent with other evidence in the record.  *See id.* (also citing Popp, 779 F.2d at 1499)

secretarial skills, had a driver's license, was able to read, write, and perform simple math, and a consulting psychologist had determined she was in the borderline level of intellectual functioning rather than mildly retarded); Lyons v. Astrue, No. 2:08cv614/FtM/29/SPC, 2009 WL 1657388 (M. D. Fla. Jun. 10, 2009) (claimant did not meet IQ criteria where he obtained a high school diploma, did not take special education classes, took care of his personal needs, earned from $13,000 to $18,000 per year for seven years, and there was evidence that he was malingering when he took the intelligence tests).  Thus, based on the foregoing, the undersigned concludes that the ALJ did not err, as his finding that Plaintiff's impairment does not meet the IQ criterion of listing 12.05C is supported by substantial evidence in the record.

> B.     Evaluation of Plaintiff's Subjective Complaints

Plaintiff contends the ALJ erred in discounting his subjective complaints of pain and other symptoms related to his lumbar DDD (see Doc. 14 at 18–19).   The Commissioner asserts that the ALJ properly evaluated Plaintiff's complaints and articulated reasons for finding Plaintiff less than fully credible, which reasons are supported by substantial evidence in the record (see, e.g., Doc. 19 at 14).

Title 20 C.F.R. § 404.1529 provides in part that the Commissioner will not find disability based on symptoms, including pain alone, "unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce these symptoms."  The Eleventh Circuit has articulated a three-part pain standard, sometimes referred to as the Hand test, as follows:

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

Hand v. Heckler, 761 F.2d 1545, 1548 (11th Cir. 1986) (originally adopting the three-part pain standard).  The Eleventh Circuit continues to follow the Hand test.  Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991); Ogranaja v. Comm'r of Social Sec., 186 Fed. Appx. 848, 2006 WL 1526062, at *3 (11th Cir. June 5, 2006) (quoting Wilson); Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1216 (11th Cir. 1991).

But "[w]hile both the regulations and the <u>Hand</u> standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, neither requires objective proof of the pain itself." <u>Elam</u>, 921 F.2d at 1215.  The court has held that "[p]ain alone can be disabling, even when its existence is unsupported by objective evidence." <u>Marbury v. Sullivan</u>, 957 F.2d 837, 839 (11th Cir. 1992) (citing <u>Walker v. Bowen</u>, 826 F.2d 996, 1003 (11th Cir. 1987)). However, the absence of evidence to support symptoms of the severity claimed is a factor that can be considered. <u>Id.</u>; <u>Tieniber v. Heckler</u>, 720 F.2d 1251, 1253 (11th Cir. 1983).

Finally, "[i]f the Commissioner refuses to credit [subjective testimony of the plaintiff concerning pain] he must do so explicitly and give reasons for that decision. . . .  Where he fails to do so we hold as a matter of law that he has accepted that testimony as true." <u>MacGregor</u>, 786 F.2d at 1054; <u>Holt</u>, 921 F.2d at 1223.  "Although this circuit does not require an explicit finding as to credibility, . . . the implication must be obvious to the reviewing court.  The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable [the district court or this Court] to conclude that [the ALJ] considered [plaintiff's] medical condition as a whole." <u>Dyer v. Barnhart</u>, 395 F.3d 1206, 1210 (11th Cir. 2005) (internal quotations and citations omitted).  The reasons articulated for disregarding the plaintiff's subjective pain testimony must be based upon substantial evidence. <u>Jones v. Dep't of Health and Human Serv's</u>, 941 F.2d 1529, 1532 (11th Cir. 1991).

Initially, as Plaintiff acknowledges, the ALJ articulated the correct pain standard (Doc. 14 at 18; Tr. 20–21, 39).  He then concluded that Plaintiff was not fully credible to the extent he is precluded from all work.  In support, the ALJ provided numerous reasons for discounting Plaintiff's complaints.  First, the ALJ noted that despite Plaintiff's reported need for a cane to ambulate, no medical source stated that a cane was necessary (Tr. 29).  In support, among other evidence, the ALJ pointed to Dr. Lucey's November 2004 examination where Plaintiff presented using a cane but displayed no difficulties walking without it (<u>id.</u> (referencing, among other evidence, Tr. 260–65)). Moreover, the record reflects no recommendation or prescription for an assistive device by any treating, examining, or consulting source.

The ALJ also considered Plaintiff's lack of ongoing medical treatment and noncompliance with what little treatment he sought and received (Tr. 30–31, 35).  In support, the ALJ referenced

some of the ER records that reflect Plaintiff's failure to take medication for his seizures (Tr. 35, Tr. 180; *see also, e.g.,* Tr. 197 (Dr. Pelaez's treatment note reflecting same)).[10]   The earlier ER records also reflect, at times, Plaintiff's failure to cooperate with ER staff (*see, e.g.*, Tr. 180 (reflecting Plaintiff's unwillingness to undergo lab work, receive treatment, or remain long enough to the sign the "left without treatment/AMA" form); Tr. 403–05 (generally reflecting same, although on this latter occasion Plaintiff signed the AMA form)).   Additionally, the record is replete with evidence that supports the ALJ's finding that Plaintiff failed to seek regular treatment.  As summarized *supra*, following Plaintiff's work-related injury he saw Dr. Ryan or his partner, Dr. Olsen, only about five times during the first two months of the time frame relevant to this appeal (that is, in January and February 2004); he saw Dr. Benton a few times in February and March 2004, but did not see him thereafter; he sought treatment on one occasion in April 2004 at the Health & Hope clinic; and he received minimal treatment at an ER in February and April 2004 (once in connection with an arrest).  Plaintiff then received no treatment whatsoever for his back pain until May 20, 2008, when he presented to the ECC.[11]  Thus, for more than four years during the relevant five-year period Plaintiff failed to pursue treatment.[12]   Moreover, although Plaintiff established treatment with the ECC in May 2008, he returned for follow up on only two occasions (July 9 and October 9, 2008), and ECC records reflect that Plaintiff failed to cooperate with ECC staff who were attempting to refer Plaintiff for additional treatment or financial assistance with medication, so the referral was cancelled (*see* Tr. 36, 450; *see also* Tr. 457 (ECC progress notes reflecting that Plaintiff would be referred to a neurologist)).

---

[10] Plaintiff acknowledges that the ER records "usually" mention "non-compliance and sub-therapeutic Dilantin levels" and that Dr. Pelaez noted Plaintiff's "problems with medication compliance" (Doc. 14 at 4–5).

[11] The court notes that the ALJ's original decision denying Plaintiff's claim for DIB and SSI was issued on June 25, 2007 (*see* Tr. 332–45).  Thus, Plaintiff did not seek additional treatment until after his claim for benefits was originally denied.  Moreover, when Plaintiff did seek additional treatment following a four-year hiatus, he did so only after (and shortly after) the AC issued its March 13, 2008, order remanding Plaintiff's case to the ALJ for a supplemental hearing.

[12] The ER records from July 2007—the extent they are considered "treatment records"—relate to a seizure and related head injury, and reflect that Plaintiff refused treatment (Tr. 403–05).

As this court is well aware, failure to seek treatment is a factor an ALJ may properly consider in evaluating a claimant's credibility.  *See* Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988) ("refusal to follow prescribed medical treatment without a good reason will preclude a finding of disability"); Watson v. Heckler, 738 F.2d 1169, 1173 (11th Cir. 1984) (ALJ properly considered Plaintiff's "failure to seek treatment after June 1981 (until after the denial of benefits by the administrative law judge)").  Although Plaintiff contends his failure to seek treatment was due to financial hardship, and therefore should not have been considered by the ALJ, his contention is refuted by the record.  For example, the record establishes that Plaintiff was able to obtain treatment when he chose to do so, at places such as the Health & Hope Clinic and the ECC.  Moreover, as the ALJ noted, Plaintiff once reported that he chose not to receive affordable medical treatment at the ECC because there were no "American" doctors there (Tr. 35 (referencing Tr. 117)).  The record also establishes, as the ALJ found, that Plaintiff was noncompliant with medications even when samples were provided to him (Tr. 36 (referencing Tr. 445)).  And, as previously noted, Plaintiff refused to cooperate with ECC staff, who were trying to refer him for additional treatment (*see id.*; *see also* Tr. 457); Plaintiff likewise refused to cooperate with ER staff or remain in the ER for treatment, which refusals to cooperate or receive treatment are wholly unrelated to Plaintiff's financial situation.  Thus, the ALJ properly considered Plaintiff's noncompliance, as it was not due to financial hardship.

Continuing, the ALJ considered inconsistent evidence in the record (*see* Tr. 35).  For example, the ALJ noted that Plaintiff gave differing accounts as to the cause of his back injury (*id.* (referencing Tr. 240 (Plaintiff's report to Dr. Ryan that he injured himself while lifting vinyl shelving over his head) and Tr. 518, 520 (Plaintiff's testimony that he injured himself by falling more than twenty feet off a ladder)).  The ALJ also pointed to Dr. Brown's report, wherein Dr. Brown noted inconsistencies in the information Plaintiff provided during his examination, as well as inconsistencies between the information provided to him (Dr. Brown) and Dr. Keller (*see* Tr. 35, 308–09).  The ALJ also noted that Plaintiff adjusted "his behavior and details according to what he want[ed] to communicate to his audience" (*id.* (referencing, among other evidence, Tr. 213 (Plaintiff's report to ER staff that he was not working, did not want to work, and had applied for disability) and Tr. 253 (Plaintiff's report to Health & Hope staff that he wanted his "back fixed" so

he could get back to work)).  The record also reflects that Plaintiff provided inconsistent information concerning the onset of his seizures.  For example, Plaintiff told Dr. Brown his seizures started in or about 1984 and followed a motorcycle accident that happened in or about 1979, he told Dr. Lucey and Dr. Pelaez that his seizures started in (approximately) 1989 or 1990 about two months after a motorcycle accident, he told Dr. Danahy his seizures started in or about 1998 "for no apparent reason," and he told ECC staff he has had seizures since (approximately) 2003 (*see* Tr. 99, 205, 309, 410, 452).  The ALJ also noted that Plaintiff told Dr. Keller and Dr. Brown different versions of his living arrangements and alcohol history (Tr. 33).  Additionally, Plaintiff told Dr. Keller that he has only one functioning lung and that "his neurologist has only given him five to seven years to live" (Tr. 267).  Although Plaintiff did have a collapsed lung (in 1985, according to Dr. Benton's report (Tr. 251)), the evidence establishes that the lung was treated, and Plaintiff recovered "without residual" (*see, e.g.*, Tr. 261).  Moreover, the lung collapse occurred prior to Plaintiff's reported fourteen-year work history, so it obviously had no effect on his ability to work at medium or heavy levels of exertion.  Furthermore, there is absolutely no evidence to substantiate Plaintiff's report that a neurologist told him he would die sometime between (approximately) 2010 and 2012.  The record also establishes, as the ALJ noted, that during Plaintiff's November 2008 supplemental administrative hearing he testified initially that he could not lift anything, but he testified later that he could lift twenty pounds (Tr. 38; *see also* Tr. 562–63, 568–69).  Plaintiff also stated he did not have a driver's license and was not allowed to drive due to seizures, but upon further questioning Plaintiff stated his driver's license had been suspended more than twelve years earlier due to multiple traffic violations (*see* Tr. 38, 563).  The ALJ did not err in considering inconsistencies in the record, such as those summarized here.  *See, e.g.*, 20 C.F.R. § 404.1529(c)(4) (in evaluating credibility the Commissioner "will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between a claimant's statements and the rest of the evidence, including your history . . .").

Next, the ALJ noted that no medical source placed limitations on Plaintiff's "functional capacity that are shown to have remained for 12 continuous months because of his musculoskeletal impairment or pain" (Tr. 38).  Indeed, as detailed *supra*, shortly after Plaintiff's work-related accident, and through February 13, 2004 (or a period of about two to three weeks), Dr. Ryan limited

Plaintiff to "sitting duties."  Although Dr. Ryan placed Plaintiff "off work" on February 13, it is evident that he did so pending referral to a neurosurgeon (*see* Tr. 237).  Also on February 13, Dr. Ryan suggested to Plaintiff that he present to an ER, where he would likely obtain a direct referral to a neurosurgeon (*see id.*).  Plaintiff did as suggested and presented to an ER the next day, on February 14, 2004, where he reported a "twisting injury at work" three weeks prior (Tr. 243, 247). ER staff conducted a neurovascular physical examination, which was normal.[13]  Plaintiff was assessed with low back pain and acute myofascial lumbar strain and released with prescriptions for Percocet and Flexeril (*see* Tr. 247) (*id.*).  Plaintiff's discharge instructions are illegible, but a box on the discharge form that states "Work/school/physical education excuse given until _____" is not checked (and the blank is not filled in) (*see* Tr. 245).  Thus, there is no evidence that the ER's neurological staff restricted Plaintiff's activities for any period of time, much less for twelve continuous months because of his musculoskeletal impairment or pain.  And finally, Dr. Benton's treatment records from late February and early March 2004 (all of which follow Dr. Ryan's treatment and the February 14 ER assessment) do not restrict Plaintiff from work for any significant period of time.  Rather, on February 26, Plaintiff was restricted from all work "until his next appointment," and on March 1, he was restricted "for a trial of one week."  At Plaintiff's last visit, on March 9, he reported improvement with the facet blocks.  Nevertheless, based on Plaintiff's wishes, a right L3-L4 semihemilaminotomy and disectomy were planned, but Plaintiff did not follow through and did not undergo the procedure (Tr. 249).  Moreover, no physical restrictions are noted in Dr. Benton's last treatment note (*see id.*).  Thus, the ALJ's finding is substantially supported by the record.

Plaintiff asserts, however, that the ALJ's statement—that <u>no</u> medical source placed limitations on Plaintiff's functional capacity for a continuous twelve-month period—is incorrect, since Dr. Lucey opined in September 2008 on a physical RFC assessment form that Plaintiff has some, long-lasting physical limitations (Doc. 14 at 17–18).  Plaintiff is correct, but any error in this

_____

[13] The neurovascular examination revealed intact and symmetrical:  1) flexion and extension strength in the knees, ankles, great toes, elbows and wrists, 2) pin prick sensation in the lower extremities, 3) dorsalis pedis, posterior tibialis, and radial pulses, 4) shoulder abduction strength, and 5) radial, ulnar, and median nerve motor function in the upper extremities (Tr. 247).  It also revealed normal capillary refill and color in the toes and fingers (*id.*).

regard is harmless.  First, the ALJ's statement appears to refer to the lack of limitations imposed by Dr. Ryan and Dr. Benton (not Dr. Lucey), as Plaintiff seemingly acknowledges (*see id.* at 17 ("[o]ne must assume that [the ALJ's] statement . . . refers to the treatment [Plaintiff] received through WC [workers' compensation] doctors Ryan and Benton)[14]).  Second, the ALJ thoroughly considered Dr. Lucey's opinions; indeed, he assigned substantial weight his opinions that are at issue here (i.e., those on the physical RFC assessment form he completed on September 3, 2008) (*see* Tr. 38; *see also* Tr. 423–28).[15]  The ALJ also presented Dr. Lucey's opinions to the vocational expert ("VE") at Plaintiff's supplemental hearing, and the VE opined that a person with those physical limitations could perform certain light jobs (*see* Tr. 423–28, 574; *see also* Tr. 39–40).  Thus, the ALJ's misstatement is harmless, since the ALJ fully considered the limitations assessed by Dr. Lucey.  Diorio v. Heckler, 721 F.2d 726, 728 (11th Cir. 1983) (misstatements harmless where ALJ applied correct legal standard despite the first misstatement, and the second misstatement was irrelevant); Pichette v. Barnhart, 185 Fed. Appx. 855, 856 (11th Cir. 2006) (ALJ's erroneous statements found to be harmless where ALJ applied proper legal standard).  Plaintiff is therefore not entitled to relief.

Finally, the ALJ noted that Plaintiff's workers' compensation claim was settled in 2005 for an approximate total of $8,000.00 and that future medical costs were not included in the settlement (Tr. 39).  The ALJ then stated, "This meager settlement further diminishes the credibility of [Plaintiff's] allegations regarding the severity of his back impairment.  It is only reasonable that [Plaintiff's] attorney would not have agreed to the settlement offer without future medical if it did not appear that the injury would either resolve or at least not worsen." (*id.*).  While the ALJ may very well be correct, the undersigned concludes that this factor is too speculative and should not have been considered by the ALJ.  This final factor, however, was but one of many reasons

---

[14] Plaintiff also asserts, assuming that the ALJ's statement refers to Dr. Ryan and Dr. Benton, that the ALJ "impermissibly penaliz[ed]" Plaintiff for his financial inability to continue treatment with those two doctors" (Doc. 14 at 17).  Plaintiff's assertion fails, however, for the reasons set forth *supra*.

[15] Dr. Lucey did not complete physical RFC assessment forms, or offer any opinions regarding Plaintiff's physical abilities, in connection with his earlier examinations of Plaintiff in 2004 and 2005.

articulated by the ALJ for discrediting Plaintiff's complaints, and the ALJ's other stated reasons—standing alone—are more than sufficient to uphold his ultimate credibility findings.

In sum, because the ALJ clearly articulated his reasons for finding Plaintiff less than fully credible, and the reasons cited are substantially supported by the record, Plaintiff is not entitled to relief.  Although Plaintiff points to certain evidence that might support a contrary credibility finding, such as certain physicians' observations of Plaintiff displaying pain, statements of lay witnesses, and the lumbar MRI results,[16] such evidence does not warrant disturbing the ALJ's credibility finding. *See* Foote, 67 F.3d at1562 (a clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court); MacGregor, 786 F.2d at 1054 (same); Martin, 894 F.2d at 1529 ("[e]ven if the evidence preponderates against the Secretary's factual findings, we must affirm if the decision reached is supported by substantial evidence"); *see also* Moore, 405 F.3d at 1212 (credibility determinations are the province of the ALJ).

C.      Whether Plaintiff's Substance Use Is a Contributing Factor Material to His Disability

As Plaintiff's final claim for relief, he asserts the ALJ erred in concluding that Plaintiff's substance use is a contributing factor material to his disability; the Commissioner asserts the ALJ did not err in this regard.

In support of this claim, Plaintiff points to Dr. Danahy's report, wherein she states that Plaintiff did not smell of alcohol and was not intoxicated at the time of her examination, yet she opined that Plaintiff would have "moderate to marked" restrictions in interacting with supervisors, co-workers, and the public, as well as in responding to changes in a routine work setting (Doc. 14 at 13 (referencing Tr. 418)).  Additionally, when the VE was presented with the "moderate to marked" restrictions imposed by Dr. Danahy, the VE opined that: 1) the restrictions "would have a negative impact on [Plaintiff's] ability to perform those jobs for which he'd be physically capable" and significantly minimize work that is available at light or sedentary levels of exertion; and 2) that

---

[16] To a large extent, Plaintiff questions the ALJ's overall conclusion that he is not disabled based on the results of the lumbar MRI (*see, e.g.*, Doc. 14 at 19).  However, the mere existence of nerve root compression, nerve root displacement, and/or DDD does not reveal the extent to which these conditions limit Plaintiff's ability to work; nor does it undermine the ALJ's determination that Plaintiff can perform light work with certain restrictions (i.e., those assessed by Dr. Lucey, which account for Plaintiff's back condition, and which were assessed after Dr. Lucey examined Plaintiff on three, separate occasions).  *See* Moore v. Barnhart, 405 F.3d at 1208, 1213 n.6 (11th Cir. 2005).

the "moderate to marked" restrictions that limit Plaintiff's ability to work with other people, particularly supervisors and co-workers, would have a "very detrimental impact on his ability to maintain employment" but would not eliminate every job (Tr. 575).  Thus, Plaintiff asserts, because Dr. Danahy examined Plaintiff when he was sober and nevertheless assessed disabling mental restrictions, the ALJ erred in concluding that Plaintiff's substance use is a contributing factor material to his disability.  Plaintiff also notes that in separate parts of the ALJ's decision he stated both that he was assigning "substantial" weight and "moderate" weight to Dr. Danahy's opinions (*see* Tr. 30, 38).  Plaintiff asserts he is entitled to relief because an "ALJ is not permitted to weigh the same evidence differently" (Doc. 14 at 14).  And finally, Plaintiff alleges that the ALJ gave alternate weight to Dr. Danahy's opinions depending on the result he wished to achieve (*id.* at 13–14).

Initially, Plaintiff's allegation that the ALJ acted with a sinister or otherwise improper motive in assigning different weight to Dr. Danahy's opinions is purely speculative and warrants no further discussion.  Next, although the ALJ assigned alternate weight to Dr. Danahy's opinions, when his doing so is placed in context the undersigned concludes he did not err (or if he did err, that the error is harmless).  At step three of the sequential evaluation, the ALJ assigned "substantial weight" to Dr. Danahy's interpretation of Plaintiff's IQ scores (on the tests *she* administered to Plaintiff), and in particular, her opinion that Plaintiff's "true abilities" are in the borderline range of functioning (*see* Tr. 30 (concluding that Plaintiff's mental impairment does not meet or equal Listing 12.05C)).  And, for the reasons discussed *supra*, the ALJ did not err in concluding—based in part on Dr. Danahy's opinions—that the IQ criterion of Listing 12.05C was not met.

Later in the ALJ's decision, he assigned only "moderate" weight to some of the functional limitations assessed by Dr. Danahy which, if accepted as true, would render Plaintiff disabled (Tr. 38).  In doing so, the ALJ noted that Plaintiff provided inconsistent statements to "almost every medical source of record," including Dr. Danahy (*see id.*).  Thus, is evident that the ALJ discounted Dr. Danahy's disabling restrictions because they were based in large part on Plaintiff's statements to her, which were uncorroborated and inconsistent with other evidence in the record.  For example, during Dr. Danahy's evaluation Plaintiff minimized his alcohol use and the problems it has caused in his life.  Similarly, he told Dr. Danahy he was hospitalized only once, twenty-two years earlier,

for alcohol problems, which directly conflicts with his report to Dr. Brown that he was hospitalized twice between 2001 and 2005 for detoxification.  He also specifically told Dr. Danahy that alcohol was not a problem in his life, but that statement is refuted by scads of evidence in the record that need not be repeated here.  Moreover, in explaining her opinions, Dr. Danahy noted that Plaintiff "denies problems with substances and resents implication that this is a part of his disability; however, with his history outside corroboration would still be helpful" (Tr. 418).  Thus, although the ALJ did not specifically state he was discounting Dr. Danahy's opinions because they were based on Plaintiff's less-than-forthright statements, the implication is clear from his decision.[17]  *See* Foote, 67 F.3d at 1561–62 (when discrediting subjective allegations, an ALJ must articulate "explicit and adequate" reasons for doing so, or "the implication must be so clear as to amount to a specific credibility finding").  Morever, the ALJ's rationale is supported by the record, especially considering that Dr. Danahy formed her opinions without obtaining any corroboration regarding Plaintiff's reported substance abuse (or lack thereof), which she specifically stated would be helpful.  Indeed, it appears she "hedged" her opinions to some extent (that is, she did not state whether the restrictions at issue here were "moderate" or "marked"; rather, she drew lines between the two selections on the assessment form, thereby indicating that Plaintiff's restrictions fell somewhere between the two levels (*see* Tr. 418)).  Furthermore, the GAF score she assigned is consistent with only "moderate" functional limitations.

Although Plaintiff's final claim for relief is based almost entirely on the ALJ's consideration of Dr. Danahy's opinions, for the sake of completeness, the undersigned will outline additional evidence the ALJ relied upon in concluding that Plaintiff's substance abuse is a material factor

---

[17] The undersigned notes that the ALJ stated in the same sentence that he was assigning "moderate" weight to the opinions of Dr. Danahy and Dr. Keller, as follows:  "In reviewing and weighing the opinions . . . from Drs. Danahy and Keller, I am compelled to assign only moderate weight . . . [because of] the seemingly endless inconsistencies in [Plaintiff's] reports . . . ." (Tr. 38).  And as to Dr. Keller, the ALJ elaborated on this finding as follows:  "Only moderate weight is given to Dr. Keller's opinion because [Plaintiff] was not completely straightforward in his responses concerning his use of alcohol and illicit drugs . . . (Tr. 32).  The ALJ also stated that Dr. Keller "seems to have taken [Plaintiff's] word . . . ." regarding certain, uncorroborated information he provided (Tr. 32).  Thus, when the foregoing sentences are read together, it bolsters the undersigned's conclusion that the ALJ discounted both Dr. Keller's opinions and Dr. Danahy's disabling restrictions because Plaintiff was not straightforward with them, yet their opinions were based in part on Plaintiff's statements.

contributing to his disability.  In relevant part, the ALJ concluded that while Plaintiff's "functional limitations as the result of his musculoskeletal impairment would not change even if [he] stopped using alcohol and/or illicit drugs," those limitations do not preclude the performance of certain unskilled light occupations (Tr. 38–39, 40).  In so concluding, the ALJ noted many of the same factors he considered in discrediting Plaintiff's complaints, such as Plaintiff's lack of ongoing care for his back condition, failure to follow medical advice, failure to take prescribed medications, and inconsistent statements (*see* Tr. 37–39).  The ALJ also noted that Plaintiff has no history of mental health treatment whatsoever, except hospitalizations for detoxification (indeed, he told Dr. Brown he did not need mental health treatment (*see* Tr. 309)), and that his other physical conditions (e.g., seizures, hypertension) are reasonably controlled—or can be reasonably controlled—if Plaintiff follows a recommended medication regimen (*see, e.g.*, Tr. 24, 27).  Moreover, Plaintiff worked for years despite his seizures, and there is no evidence indicating they worsened in severity or frequency after the date Plaintiff alleges he became disabled.

The ALJ also highlighted the evidence in the record that documents Plaintiff's long history of alcohol abuse.  For example, the ALJ noted that Plaintiff was diagnosed with history of alcohol dependence or "alcoholism," he admitted he was a "chronic drunk" for most of his life and that for an approximate thirty-two-year period he drank a fifth of vodka daily and drank to pass out, and he stated that alcohol "destroyed his working life" (Tr. 25, 32, 309–10).  Plaintiff also stated that he "stayed in trouble," spent time in jail, and was admitted for in-patient detoxification twice since 2001, and the ALJ noted that some charges that landed Plaintiff in jail were alcohol related (Tr. 32, 309).  The ALJ also noted Plaintiff's own statements, including his report that "the happiest times of his life were when he was working and could "hang out" and drink with his co-workers (Tr. 25, 310).  The ALJ also referenced some of Plaintiff's ER visits, where at times he smelled strongly of alcohol, was too intoxicated to sign his name, or presented with withdrawal symptoms when he was "out of alcohol," as well as Dr. Lucey's observation that Plaintiff smelled strongly of alcohol when he examined him in 2004 (and that Plaintiff admitted to Dr. Lucey that he continued to drink alcohol and smoke marijuana) (Tr. 27, 31–32).

Morever, the ALJ found, based in part on Plaintiff's same report to Dr. Pelaez, that many of his mental limitations or depression-related symptoms, such as tiredness, difficulty sleeping,

helplessness, and feelings of worthlessness, are because of his use of alcohol (Tr.  31 (referencing Tr. 205); *see also* Tr. 37).  The ALJ also noted that Plaintiff told Dr. Brown he believed his biggest impediment to working is his limited ability to stand and bend because of his back (Tr. 25 (referencing Tr. 310)).  Additionally, the record reveals that Plaintiff lives without assistance and performs daily activities without any problems (except those related to his physical condition), such as dating, riding the city bus, shopping, and washing dishes and clothes, and at least two medical sources opined that Plaintiff is capable of handling his own finances.  *See* Doughty, 245 F.3d at 1281 (ALJ did not err in determining that alcoholism was a material contributing factor to claimant's disability where, among other evidence, the record revealed that a medical source stated that he believed claimant was capable of handling his own financial affairs and claimant testified that he was able to carry out daily activities).  As discussed *supra*, the "key factor" in a materiality determination "is whether the claimant would still be found disabled if he stopped using drugs or alcohol," *id.* at 1279 (citing 20 C.F.R. § 404.1535(b)(1)), and "the claimant bears the burden of proving that the substance abuse is not a contributing factor material to the disability determination . . . ." *Id.* at 1281.  Plaintiff has failed to carry his burden.

Thus, in sum, having reviewed the record, the undersigned concludes that substantial evidence supports the ALJ's finding that Plaintiff's substance use is a contributing factor material to his disability.

VI.   CONCLUSION

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed.  42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at1560. Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

At Pensacola, Florida this 24<u>th</u> day of August 2011.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


**<u>NOTICE TO THE PARTIES</u>**

**Any objections to these proposed recommendations must be filed within fourteen (14) days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**